STATE OF MAINE
YORK, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-00-001
GAB - YOR - 2/12/2001

CHARLES L. NARDI, et al.,

     Plaintiffs

  v.

                     **ORDER**

THE TOWN OF KENNBUNKPORT,
et als.,

     Defendants

## I. FACTS

Plaintiffs Charles and Marie Nardi are owners of a residential dwelling and property located at Skipper Joe's Point[1] in Kennebunkport, Maine. Defendant Constance Boston is the owner of a residential dwelling and property that abuts the Nardis' property. The Boston property is approximately 6 acres in size. Defendants Timothy and Linda O'Neill signed a contract to purchase Ms. Boston's property. The contract was conditional upon confirmation that the O'Neills may legally construct a new single-family residence on the Boston property.

On July 19, 1999, the Code Enforcement Officer (CEO) for Defendant Town of Kennebunkport ('the Town") issued two building permits to Ms. Boston and the O'Neills authorizing the remodeling of the existing structure on the Boston property and the construction of a new single-family dwelling on the Boston

---

1 Because Skipper Joe's Point was, until fairly recently, known as "Nessler Point," the administrative record contains some references to "Nessler Point."

property. Plaintiffs filed an administrative appeal with the Kennebunkport Zoning Board of Appeals ("the Board"), protesting the issuance of these building permits. After conducting hearings, the Board voted to deny the Plaintiffs appeal. Plaintiffs now appeal that decision. For reasons stated below, the appeal is Granted.

## II. STANDARD OF REVIEW

This Court must decide whether there was an abuse of discretion, erroneous interpretation of the law or findings not supported by substantial evidence in the record. Grant's Farm Assocs., Inc. v. Town of Kittery, 554 A.2d 799, 801 (Me. 1989).

The interpretation of provisions in a zoning ordinance is a question of law for the Court. Town of Union v. Strong, 681 A.2d 14, 17 (Me. 1996). The interpretation of a statute by an administrative agency is entitled to deference and will be upheld unless the statute plainly compels a contrary result. Wood v. Superintendent of Ins. 638 A.2d 67,70 (Me. 1994).

With regard to factual determinations made by the Board, a plaintiff seeking to overturn the decision of a board of appeals has the burden of showing that the evidence compels a contrary conclusion. Boivin v. Town of Sanford, 588 A. 2d 1197, 1199 (Me. 1991). If there is relevant evidence in the record to reasonably support the Board's conclusion, the fact that the record contains inconsistent evidence or inconsistent conclusions could be drawn from the evidence does not invalidate the Board's holding. Id.

# III. DISCUSSION

## A. The Framework

The Plaintiffs present three principal arguments in support of their challenge to the CEO's decision to issue a building permit. Before addressing these arguments, an overview of the regulatory framework is helpful.

The Town's Zoning Maps are legislative enactments and require the participation of the public before being adopted. 30-A M.R.S.A. § 4352. In Kennebunkport, the Board of Selectmen must first hold a public hearing before a zoning text or map amendment may be adopted by referendum or written ballot. Land Use Ordinance § 12.1, **R. Tab 63 at p. 635.**

The Town has adopted two Zoning Maps depicting the boundaries of the Town's zoning districts: one for the general zoning districts within the Town (**R. Tab 63 at p. 637**) and one for the Shoreland Zoning districts (**R. Tab 63 at p. 636**). The Shoreland Zoning districts, consisting of the Shoreland Zone and the Resource Protection Zone, comprise an "overlay zone" which is superimposed over the general zoning districts. Ordinance § 3.3(K), **R. Tab 63 at p. 524.** Section 3.3 of the Ordinance provides written descriptions of all districts. The general zoning districts are described by precise, metes-and-bounds descriptions. Ordinance § 3.3(A)-(J), **R. Tab 63 at pp. 516-24.** In contrast, the overlay zones are described as lands that either (a) are located within a specified distance of certain natural resources (the Shoreland and Critical Edge Zones), or (b) contain certain natural resources (the Resource Protection Zone). **R. Tab 63 at pp. 524-26.** Within the Critical Edge Zone, no new

3

residences may be constructed except on vacant lots that were of record as of March 22, 1988. Ordinance § 5.5 (C), **R. Tab 63 at p. 548.** No residences may be built in the Resource Protection Zone. Ordinance § 5.3(B), **R. Tab 63 at p. 545.**

To the extent that conflicts arise between the text of the Ordinance and the map depictions of the zoning districts boundaries, § 3.2 of the Ordinance provides that the written description shall govern. **R. Tab 63 at p. 516.** If further clarification is necessary regarding the Shoreland and Resource Protection Zone boundaries, the Growth Planning Committee is vested with the power to make a determination in accordance with the purposes, intent and requirements of the ordinance. **R. Tab 63 at p. 516.**

Maine statutes create procedures for amending the Shoreland and Resource Protection Zones. 38 M.R.S.A. § 438-A(1-B). Before they can become effective, any amendments to the Shoreland Zoning regulations must be approved by the Commissioner of the Maine DEP. 38 M.R.S.A. § 438-A(3); Ordinance § 12.2, **R. Tab 63 at p. 635.**

The Atlantic Ocean abuts the Boston property on two sides. **R. Tab 15 at pp. 34, 39.** Under § 5.4(I)(1) of the Land Use Ordinance, all new structures within the Shoreland Zones must be setback at least 75 feet from the "normal high water mark" of the Atlantic Ocean. **R. Tab 63 at p. 560.** In the context of coastal waters, § 2.2 of the Ordinance specifically defines the "normal high water mark" as "that line on the shore of tidal waters which is the apparent extreme limit of the effect of tides; i.e., the top of the bank, cliff, or beach above high tide." **R. Tab 63 at p. 509.**

The collective significance of the foregoing regulations, and the three issues on appeal are as follows:

(a) If the Boston property is located within the Resource Protection Zone, the proposed O'Neill residence cannot be built at all, because residences are not permitted within that zone.

(b) If the Boston property is located within the Critical Edge Zone, the proposed O'Neill residence cannot be built at all, because new residences are permitted only on vacant lots of record.

(c) If the CEO misidentified the "normal high water mark" in a position that was too far seaward, the proposed O'Neill residence would be less than 75 feet from the normal high water mark and would have to be either moved, reduced in size, or abandoned.

## B. Is the Boston Property Located Within the Resource Protection Zone?

**Arguments:**

It is undisputed that the Shoreland Zoning Map shows the Boston property as being within the Resource Protection Zone. However, the Board ruled that the Boston property should not be included in the Resource Protection Zone because it did not contain the natural resources listed in §3.3(L) of the Land Use Ordinance. **R. Tab 58.** Plaintiffs argue that this ruling was erroneous as a matter of law because regardless of the evidence submitted to it, the Board was without legal authority to exempt the Boston property from the Resource Protection Zone. The Plaintiffs argue that the only agency that has jurisdiction to even clarify the boundaries of the

the Resource Protection Zone is the Growth Planning Committee.[2] See § 3.2, **R. Tab 63 at p. 516.**

The Plaintiffs see no conflict between the shoreland zoning map and the text of § 3.3(L). They argue that the shoreland zoning map establishes prima facie that the property is within the Resource Protection Zone and that the text description of the Resource Protection Zone contained in § 3.3(L) refers only to several categories of natural resources that _may_ cause a property to be mapped within the Resource Protection Zone. They observe that the text of § 3.3 (L) does not describe the boundaries of the Resource Protection Zone. Therefore, Plaintiffs argue, because the only source of information about the boundaries of the Resource Protection Zone is the Shoreland Zoning Map, these boundaries must be adhered to by the Board.

---

[2] In their reply brief, the Plaintiffs expand on their argument regarding the importance of the Growth Planning Committee. They argue that the Board can base decisions on only the specific facts before it in a given hearing, and has no ability to make policy decisions or to consider how the clarification of a Shoreland Zoning district may impact the overall Shoreland Zoning scheme. The Plaintiffs claim that it was the voters intent that these types of analyses could only be made by the Growth Planning Committee and that this was evidenced by the rejection of Question Five on the Kennebunkport Referendum Warrant on March 21, 2000. Question Five proposed the abolition of the Growth Planning Committee and the amendment of § 3.2 and § 12. 1 of the Land Use Ordinance so as to transfer the functions of the Growth Planning Committee under those sections to the Planning Board (see Attachment to Plaintiffs' Reply Brief). The Plaintiffs' argue that the amendment would have essentially incorporated the Board's decision in this case and that "there could hardly be a clearer expression of legislative intent than for the voters to reject amendments that would have codified the [Board's] interpretation of Articles 3.2 and 3.3(M)."

The Defendants object to this attachment (see Defendants Objection to the Attachments to Plaintiffs' Reply Brief and any References Thereto). They note that the amendment to the Zoning Ordinance was proposed after the Zoning Board of Appeals rendered a decision on Plaintiffs' appeal and was not a part of the Rule 80B record as agreed to by the parties.

This proposed amendment , which may or may not be an expression of disagreement with the Board's decision in this case, adds nothing new to the record. Section 3.2 still vests the Growth Planning Committee with the power to clarify the Shoreland and Resource Protection Zone boundaries, and the Board argues that it did not usurp the role of the Committee.

The Defendants counter that when considering administrative appeals, the Board is authorized to interpret the Ordinance. 30-A M.R.S.A. § 4353(2)(A). Under § 9.2(A)(2) of the Ordinance, in hearing administrative appeals, "whenever there is uncertainty as to the meaning and/or intent of any part of this Ordinance, the Board of Appeals shall have the power to interpret such part." **R. Tab 63 at p. 604.**

Defendants argue that determining what zoning district a certain parcel of land is located in involves interpreting the Ordinance. Although Plaintiffs assert that the Ordinance vests the Growth Planning Committee with exclusive jurisdiction to clarify the boundaries of the Resource Protection Zone, here, Defendants argue, neither the CEO nor the Board were "clarifying the boundaries of this overlay zone" - rather they were interpreting the Ordinance to determine whether the Boston property was located in that zoning district under the terms of the Ordinance.

Two provisions of the Ordinance provide that if there is any conflict between the text of the Ordinance and any map, the text controls. §§ 2.1, 3.2, **R. Tab 63 at pp. 498, 516.** Defendants offer three reasons to explain the importance and usefulness of these provisions. First, the Resource Protection overlay zone is shown as the same land areas as the underlying zoning districts. There appears to have been no effort to match up the natural features listed in § 3.3(L). Defendants contend that it would be unusual for a municipality to spend the time and resources to visit every single parcel of land within such a large land area and inventory the natural features on

7

each parcel in order to develop a shoreland zoning map.[3]

Second, according to the Shoreland Zoning Map, the Resource Protection overlay zone is larger in land area than the Shoreland overlay zone, even though the text of the Ordinance defines the Resource Protection overlay zone to be only "that portion of the Shoreland Zone" that includes land areas with certain specific natural features. Third, the Critical Edge overlay zone is not shown on the zoning maps. Therefore, without the text of the Ordinance to define the district boundaries, there would be no Critical Edge Zone.

The Defendants contend that a conflict existed between the Shoreland Zoning Map and the text of § 3.3(L). Through both oral and written evidence, the Defendants argue that the Boston/O'Neills presented substantial evidence that the Boston property does not meet any of the nine criteria set forth in § 3.3(L). At the December 6, 1999 Board meeting, Mrs. Boston's attorney analyzed each of the nine criteria for the Board, supported by expert opinion where necessary. **R. Tab 46 at 313-14.** Plaintiffs did not present any contrary evidence on any of these criteria, with the exception of soil type. § 3.3 (L)(8), **R. Tab 63 at p. 525.** The Boston/O'Neills' site

---

[3] Plaintiffs argue that the drafters of the Land Use Ordinance and Shoreland Zoning Map made precise and deliberate decisions about what land areas should be included in, or excluded from the Resource Protection Zone. For example, they note that: (a) only an irregular section of the Goose Rocks Zone, coinciding with the banks of rivers and other inland water bodies is included in the Resource Protection Zone; (b) although much of the Village Residential Zone is also within the Resource Protection Zone, a large portion of the river frontage in the Village Residential Zone is included only within the Shoreland Protection Zone; (c) the Village Residential East Zone, despite having significant ocean frontage, is not included within any of the Shoreland Zones.

Unfortunately, it is not clear from the photocopy of the Shoreland Zoning Map (**R. Tab 63 at p. 636;** see also attachment to Defendants' Brief) exactly where the Resource Protection Zone lies. As noted above, however, it is not disputed that the Boston property is within the bounds of the Resource Protection Zone.

8

evaluator, Joseph Noel, indicated that he had conducted four test pits on the property in order to complete the septic system design for the property. **R. Tab 39 at p. 232.** The Plaintiffs presented contrary testimony from a neighbor, Jan Collins. **R. Tab 46 at p. 331-32.** The Defendants argue that Ms. Collins was not a site evaluator or soil scientist and had not conducted any test pits on the property. The Court must defer to the Board's assessment of the credibility of the witnesses and the evidence before it. <u>See</u> <u>Town of Steuben v. Lipski</u>, 602 A.2d 1171, 1172 (Me. 1992). Accordingly, the Board argues that its determination that the Boston property is not located in the Resource Protection overlay zone because it does not meet any of the criteria set forth in § 3.3(L) of the Ordinance is supported by substantial evidence in the record.

Plaintiffs respond that Defendants' "conflict" argument can succeed only if they can point to a textual provision of the Land Use Ordinance that, on its face, indicates that the Boston property is not to be included with the Resource Protection Zone. The Defendants have argued that, based upon the <u>evidence</u> before the Board, the Board could rationally find that there was a conflict between the text description and the mapped location of the Resource Protection Zone. However, Plaintiff's argue, § 3.2 does not refer to conflicting evidence, but to conflicting language in the two enactments, and the Defendants have not cited any conflict between the <u>text</u> of the Ordinance and the boundaries drawn on the Shoreland Zoning Map. Plaintiffs assert that whether a statute is ambiguous is to be determined from the <u>face</u> of the document itself and only if the document is first found to be ambiguous may a party

introduce evidence purporting to clarify that ambiguity. In this case, Plaintiffs note, the language of § 3.3(L) does not , on its face, conflict with the Shoreland Zoning Map.

Although the Boston/O'Neills argue that there was competent evidence to support the Board's conclusion that the Boston property lacked the natural resources set forth in § 3.3(L), the Plaintiffs' argue that the Board's conclusion on that point is legally irrelevant because the Board may not overrule the voters' legislative judgment about how the boundaries of the Resource Protection Zone ought to be drawn on the Shoreland Zoning Map. The Plaintiffs' argue that this map is a legislative enactment - hence the Board could not legally alter the boundaries approved by the voters even if it sincerely believed that those boundary lines were drawn in the wrong place.

To the extent that § 3.2 could be construed as authorizing the Board to alter the zoning district boundaries shown on the shoreland zoning map, the Plaintiffs argue that § 3.2 is void and unenforceable. Under Maine statutes, the shoreland zoning map is a legislative enactment. See 30-A M.R.S.A. § 4352. These boundaries are fixed unless altered pursuant to procedures set forth in 30-A M.R.S.A. § 4352. The Plaintiffs argue that this power may not be delegated from the legislature to the municipality or from the municipality to a local administrative body without a sufficiently detailed statement of policy to furnish a guide which will enable those to whom the law is to be applied to reasonably determine their rights thereunder, and so that the determination of those rights will not be left to the purely arbitrary

10

discretion of the administrator. Similarly, an ordinance is unconstitutionally vague when it sets guidelines that would force persons of general intelligence to guess at its meaning.

Applying the above doctrines to the present case, the Plaintiffs argue that § 3.2 provides no guidance, either to the Board, property owners, or affected abutters, as to how one would adjudicate a claim that a given property should be exempted from the zone in which it is mapped. Plaintiffs note that § 3.2 does not even suggest how the burden of proof should be allocated and argue that the Boston/O'Neills submitted a scant amount of information, through their attorney and experts, concerning the nonexistence of certain resources on the Boston property. **R. Tab 46, 313-15.**

Therefore, Plaintiffs conclude that even if § 3.2 had been intended to grant the Board discretion to remove properties from the zoning districts as shown on the shoreland zoning map, that section fails to provide any standards to govern the Board's discretion and to that extent, § 3.2 is an unconstitutional delegation of legislative power and/or unconstitutionally vague.

Two cases have addressed similar issues regarding Resource Protection Zones. First, in <u>Veerman v. Town of China</u>, CV-93-353 (Superior Court, April 13, 1994)(Alexander, J)[4] a building permit was denied because the CEO determined that the Plaintiffs' property should have been included in the Resource Protection Zone. The Court assumed that there was sufficient evidence to support the CEO's

_____

[4] See attachment to Plaintiffs Rule 80B Brief.

11

determination, but found that the administrators of a zoning ordinance may not unilaterally change zoning boundaries adopted by the municipal legislative body. The Court stated that allowing zoning administrators to amend boundary lines would open the door to considerable mischief in an area already affected with considerable factfinding discretion and unpredictability:

> In effect, the lines on zoning maps could be rendered worthless and the integrity of zoning plans undermined if administrators could determine, on a case-by-case basis, that individual lots really did not belong within their designated zones. The administrator who readily places lots within a resource protection district today may be replaced tomorrow by one who readily takes them out. It is precisely to avoid these concerns that zoning map drawing is committed to the legislative function, and administrative moving of map boundaries lines is barred, subject only to closely prescribed variance criteria. Id. at 3.

Second, in Coastal Property Associates Inc. v. Town of St. George, 601 A.2d 89 (Me. 1992), the ordinance included a map depicting the Resource Protection Zone and a brief written description of the map. The Court found that Coastal's property was unquestionably in the Resource Protection District as shown on the map. However, Coastal argued that the text of the ordinance limited the Resource Protection District to the marsh only, which lay outside the property in question. The Court agreed with the Town that the text was merely illustrative and was included to make it easier to locate the districts on the map, but the map itself had to be referred to in order to identify a district's precise borders. Id. at 90. In reaching this conclusion, the Court relied on the rule of interpretation provided by the Ordinance, which required that the boundaries of the Shoreland Zoning Map not be set forth on the Map before other sources are referred to. The opposite rule of construction applies in the present case - the written description governs in the

12

event of a conflict between the map and and the written description. However, the question remains whether or not a conflict exists - or as plaintiffs argue, does § 3.3(L) not define boundaries, but rather refer to natural resources that may cause a property to be included within the Resource Protection Zone.

This argument is not entirely convincing because § 3.3(L) contains what appears to be a complete, exhaustive list of natural features that are included within the Resource Protection Zone. It is not a list that is merely suggestive of the types of natural features that are to be protected. However, unlike § 3.3 (A) to (J), you cannot locate the boundaries of the Resource Protection Zone using the description provided in § 3.3 (L) alone - the map must be referred to delineate boundaries.

Taken to its logical conclusion, Defendants' position would render the official map entirely superfluous. Regardless of the boundaries drawn on the map and adopted by the Town, the Board would be left to making case-by-case determinations regarding whether or not the natural features listed in § 3.3(L) were contained within any given property in the Resource Protection Zone. Although not binding on this Court, Justice Alexander's concern in Veerman is instructive. If zoning boards unilaterally decide whether or not individual lots are properly placed within the designated zones, the integrity of the zoning map is undermined and the legislative function of map drawing is usurped by the zoning board.

The Board is authorized to interpret the Ordinance. 30-A M.R.S.A. § 4353(2)(A); Ordinance § 9.2(A)(2), R. Tab 63 at p. 604. An agency's interpretation of a statute or regulation it regularly administers is to be granted "great deference" and

13

must be upheld unless the regulation "plainly compels a contrary result." <u>Wright v. Town of Kennebunkport</u>, 1998 ME 184, ¶ 5, 715, A.2d 162, 164.

Section 3.2 vests the ability to "clarify" the boundaries of the Resource Protection Zone in the Growth Planning Committee. As well, all ordinances, including maps, may be amended only after notice and a public hearing. 30-A M.R.S.A. § 4352(9); Ordinance § 12.1, **R. Tab 63 at p. 635.** In addition, Ordinance § 12.2 and 38 M.R.S.A. § 438-A(3) provide that the Commissioner of the DEP must approve amendments to shoreland zoning ordinances. "Individual provisions must be interpreted in harmony with the overall scheme of a zoning ordinance." <u>Cumberland Farms, Inc. v. Town of Scarborough</u>, 1997 ME 11, ¶ 6, 688 A.2d 914. These provisions, read together, seemingly evince an intent to preclude the Board from making unilateral decisions regarding the changes to the Resource Protection Zone. There can be no dispute that the Board's decision in this case effectively changed the boundaries of the Resource Protection Zone to exclude the Boston property. Because it is undisputed that the Boston property is within the Resource Protection Zone and because the Board was without the authority to unilaterally alter the boundaries, a new residence may not be built on the property.

## C. Is the Boston property located within the Critical Edge Zone?

1. Definition of Coastal Wetland within the Critical Edge Zone

The Critical Edge overlay zone is not shown on either of the official zoning maps. Under § 3.3 (M) of the Land Use Ordinance, the Critical Edge Zone extends for a distance of 150 feet inland from any coastal wetland. **R. Tab 63 at p. 526.**

14

Section 3.3(M) of the Land Use Ordinance does not contain any special definition of "coastal wetland." The Board, in its Administrative Appeal Decision, found that the term "coastal wetland" as used in § 3.3(M) of the Ordinance does not include areas along the open ocean and along the Kennebunk River because to include such would create an irresolvable conflict with those sections of the Ordinance which specifically allow construction and various uses within 150 feet of the ocean. The Board concluded that coastal wetland, as used in § 3.3(M) is limited to those wetlands as described in the Kennebunkport Comprehensive Plan Inventory and Analysis dated March 31, 1996 and excludes the beach along the Atlantic Ocean which borders the Boston property. The Kennebunkport Comprehensive Plan Inventory states that:

> A wetland is characterized by wetland vegetation, standing water most of the year, and very poor drainage. . . . Wetlands may be classified as either coastal or freshwater. . . . Most of Kennebunkport's coastal shoreline is rocky, but there are a number of small coastal wetlands scattered among the coast. Coastal wetlands are those which are influenced by tidal action and contain salt tolerant vegetation. Most of the coastal wetlands in Kennebunkport are owned by the Federal Government as part of the Rachel Carson National Wildlife Refuge . . .
> Of the coastal wetland areas, a significant part is zoned Resource Protection, and most of this area is under the jurisdiction of the Rachel Carson Wildlife Refuge.
> R. Tab 40 at p. 252.

Plaintiffs argue that the Board had no power to rely upon a planning document to supply a definition of coastal wetland. Plaintiffs argue that § 3.3(M) incorporates the general definition of "coastal wetland" contained in § 2.2.[5] R. Tab

---

[5] The Plaintiffs argue that on March 21, 2000, the Kennebunkport voters had the opportunity to approve an amendment to the Land Use Ordinance that would have codified the Board's interpretation of how the term "coastal wetland" should be interpreted within the context of the Critical Edge Zone. See Question Ten, Attachment to Plaintiffs Reply Brief. Question Ten was defeated. The Plaintiffs argue that the Board's interpretation of the Critical Edge Zone does not reflect the actual intent of the

15

**63 at p. 513-14.** Under § 2.2, "coastal wetlands" are defined as:

> <u>Tidal and subtidal lands</u> including all areas below any identifiable debris line left by tidal action; all areas with vegetation present that is tolerant of salt water and occurs primarily in a salt water or estuarine habitat; and any swamp, marsh, bog, beach, flat or other contiguous low land which is subject to tidal action during the maximum spring tide level as identified in tide tables published by the National Ocean Service (emphasis added).[6]

The Plaintiffs argue that they presented evidence to the Board showing that the Boston property was bordered on three sides by coastal wetlands and that the building site for the proposed O'Neill residence is located entirely within the Critical Edge Zone. **R. Tab. 17; Tab 38; Tab 41 at pp. 259-63; Tab 42 at pp. 265-66; Tab 46 at pp. 295-300.** The Board was informed by the Shoreland Zoning Coordinator of the DEP that a "coastal wetland includes all tidal and subtidal lands ... [and] clearly includes ocean front areas submerged at high tide. Essentially, the Atlantic Ocean is a large coastal wetland." **R. Tab 48 at p. 359.** Under § 5.5(C) of the Land Use Ordinance, no new residences can be built within the Critical Edge Zone on lots that already contain a residential structure. **R. Tab 63 at p. 548.** As a result, Plaintiffs argue that the CEO could not legally have approved the proposed O'Neill residence, which was to be sited within the Critical Edge Zone.

---

voters.

The Defendants object to this Attachment (see Defendants Objection to the Attachments to Plaintiffs' Reply Brief and any References Thereto). They note that the amendment to the Zoning Ordinance was proposed after the Zoning Board of Appeals rendered a decision on Plaintiffs' appeal and was not part of the Rule 80B record as agreed to by the parties.

The "Critical Edge Issue" can be resolved without reference to this referendum.

[6] The definition goes on to provide twenty-six examples of saltwater-tolerant vegetation that are indicative of a coastal wetland.

This definition is essentially the same as the definition contained in the Mandatory Shoreland Zoning Act, 38 M.R.S.A. § 436-A(1) and the Protection of Natural Resources Act, 38 M.R.S.A. § 480-B(2). The "Critical Edge" concept is not mentioned in either of these Acts.

16

In support of the Board's decision, the Defendants offer three main arguments to illustrate that the Ordinance as a whole does not support the broad definition of "coastal wetlands" advanced by Plaintiffs.

First, Defendants argue, the Critical Edge Zone can not be subject to the § 2.2 definition of coastal wetlands because such a construction would conflict with portions of the ordinance that allow water-dependent uses to be built with no setback from the Atlantic Ocean. That is, if all land lying upland and 150' from the normal high water mark of the Atlantic Ocean is included in the Critical Edge overlay zone, all boatyards, marinas, piers, docks, bridges, breakwaters etc. would be prohibited, thus making § 5.3(B) &(C) surplusage. **R. Tab 63 at p. 544-45.** Defendants also note that Plaintiffs' proposed interpretation would place the Ordinance in direct conflict with statutory requirements. See 30-A M.R.S.A. § 4326(3)(E)(requiring that a municipal comprehensive plan "ensure the preservation of access to coastal waters necessary for commercial fishing, commercial mooring, docking and related parking facilities."). Plaintiffs respond that the Boston/O'Neills are proposing a single family residence, and, as such, have no standing to champion the interests of maritime businesses or other non-residential uses not at stake in this appeal that potentially raise very different policy considerations than does the proposed O'Neill residence. Plaintiffs point out that the O'Neills propose to build a new dwelling on the Boston property, which is the only use specifically proscribed under § 5.5 of the Ordinance.

17

Second, Defendants argue, if all coastal wetlands fronting on the Atlantic Ocean are included in the Critical Edge overlay zone, the Critical Edge regulations conflict with other Ordinance provisions establishing setbacks. For example, § 5.6(I) requires a 75' setback from normal high water for structures in the Shoreland Zones. Structures used exclusively for water dependent uses have no set back requirements for the normal high water mark. **R. Tab 63 at p. 560.** Section 5.6(H)(1) of the Ordinance requires that roads and driveways be setback 75' from the normal high water mark. Defendants conclude that these and other sections would be superfluous if the Critical Edge Zone is defined to include all coastal wetlands fronting on the ocean. The Plaintiffs counter that the Defendants are "mixing apples and oranges" because the Critical Edge Zone established <u>use</u> restrictions and is not itself a setback regulation.

Third, Defendants argue, if all coastal wetlands fronting on the Atlantic Ocean are included in the Critical Edge overlay zone, certain other Ordinance provisions are surplusage. For example, § 3.3(K) defines the Shoreland zone as those land areas lying 250' from tidal waters and from coastal and freshwater wetlands. "Tidal waters" are defined as part of § 2.2 to include "any body of water which is subject to tidal action, including the Kennebunk River." **R. Tab 63 at p. 499.** Defendants argue that if the "coastal wetlands" definition includes tidal areas, then the inclusion of both "tidal waters" and "coastal wetlands" in the definition of the Shoreland Zone is surplusage. As well, Defendants note that while the definition of the Shoreland Zone specifically includes both "tidal waters" and "coastal wetlands" to measure to

18

250' overlay zone, the definition of the Critical Edge zone includes only "coastal wetlands" and omits reference to "tidal waters." The Defendants argue that this omission supports their argument that open waters of the Atlantic Ocean and the beach and rocks along the Atlantic Ocean are not included within the Critical Edge Zone. Plaintiffs counter that the fact that two statutory terms may be redundant does not render either of them "surplusage" - rather, a surplusage occurs only when two statutory provisions conflict to the extent that one of them would be rendered meaningless. The Plaintiffs conclude that the fact that in § 3.3(K), the Shoreland Zone is described as being located within 250 feet of "tidal waters," and the § 2.2 definition of "coastal wetlands" refers to subtidal lands, does not create a redundancy, let alone a surplusage, because the purpose of § 3.3(K) is to define the Shoreland Zone as an area located within 250 feet of various types of water resources, and the aim of § 2.2 is to describe types of land areas that will be considered coastal wetlands.

2. The History of the Critical Edge Zone

The Defendants argue that the historical development of the Critical Edge overlay zone demonstrates that the term "coastal wetland" in § 3.3 should not be interpreted to include coastal wetlands fronting on the Atlantic Ocean. A large portion of coastal York County property is located in or near the Rachel Carson National Wildlife Refuge. According to Dan Fleischman, senior planner with the Southern Maine Regional Planning Commission, in the mid-1980s, with congressional authorization and funding pending, the United States Fish and

Wildlife Service sought the cooperation of municipalities to expand the Rachel Carson National Wildlife Refuge boundaries to include upland areas adjacent to the Refuge wetlands. **R. Tab 46 at p. 328.** Fleischman testified that it was the Fish and Wildlife Service that came up with the term "critical edge," and asked that municipalities have more restrictive zoning for the upland areas adjacent to the Refuge wetlands.

The term "critical edge" and accompanying regulations governing this area were not expressly used in the Town's zoning ordinance until 1988. **R. Tab 50 at p. 391-96.** The Critical Edge area was defined as a strip of land 150′ in width upland and parallel with the edge of the coastal wetland, "which coastal wetland exists on property owned by the United States Fish and Wildlife Service or on property abutting that owned by the United States Fish and Wildlife Service, and which is shown on a map entitled "Critical Edge Map, Town of Kennebunkport, 1988." **R. Tab 50 at p. 393.** A specific definition of the term "coastal wetland" for the purposes of the "Critical Edge-Rachel Carson Wildlife Refuge" was adopted and was defined as areas containing vegetation that is tolerant of salt water. **R. Tab 50 at p. 21.**

By July 1997, the Town had repealed this definition of "coastal wetlands" set forth in the "Critical Edge-Rachel Carson Wildlife Refuge" regulations and amended the general definition by adding the list of salt tolerant vegetation that had formerly been included in the special definition of "coastal wetlands" set forth in the Critical Edge regulations. **R. Tab 50 at 397-404.** The Town retained the definition of Critical Edge as the strip of land 150′ upland and parallel with the edge of the

coastal wetland, "which coastal wetland exists on property abutting that owned by the United States Fish and Wildlife Service, and which is shown on a map entitled 'Critical Edge Map, Town of Kennebunkport, 1988.'" **R. Tab 50 at p. 400.**

In June of 1998, amendments to the zoning ordinance transferred the contents of § 5.15 regarding the Critical Edge to other sections of the ordinance and altered the definition of Critical Edge by deleting references to the Critical Edge Map and the U.S. Fish and Wildlife Service. **R. Tab 39 at pp. 237-38.** According to the Defendants, the reference to the Critical Edge map was deleted because the map could not be located.

The Town did retain references in the Critical Edge use regulations to the "Critical Edge-Rachel Carson Wildlife Refuge." Ordinance § 5.5, **R. Tab 63 at p. 547.** The Town also retained the reference to the "Critical Edge-Rachel Carson Wildlife Refuge" in § 11.4(C)(6) of the Ordinance, which requires the CEO to notify the Conservation Commission and the district offices of the Rachel Carson Wildlife Refuge and solicit their input on any application for a permit in the Critical Edge zone. The Defendants argue that the fact that all Critical Edge permit applications continue to be reviewed by the Refuge is further evidence that the Town did not intend the 1998 deletion of the reference to the 1988 Critical Edge Map to have the dramatic effect that Plaintiffs assert it does. Defendants note that there is nothing in the record to show that the 1998 amendments were submitted to the Commissioner of the DEP. See 38 M.R.S.A. § 438-A(3)(amendments to municipal shoreland zoning ordinances are not effective unless approved by the DEP).

21

The Plaintiffs counter that a resort to legislative history to explain the meaning of a statute or ordinance is proper only if the Court first finds that the enactment is ambiguous on its face. Accordingly, the Plaintiffs argue that there is nothing ambiguous about § 3.3(M) of the definition of coastal wetlands. As well, Plaintiffs argue that the history of the Critical Edge regulations shows a steady progression: (a) away from identifying the Critical Edge as a mere accommodation to the Rachel Carson Wildlife Refuge, and (b) toward establishing the Critical Edge as an independent overlay zone protecting all coastal wetlands. In general, the Plaintiffs do not dispute the history as presented by Defendants, but they interpret the history differently. Plaintiffs argue that in July 1997, when the Town repealed the special definition of "coastal wetlands" that had been enacted in 1988, the Critical Edge zone became subject to the general definition of "coastal wetlands" that is still in effect today. **R. Tab 50 at pp. 391-93; 397-401.**

Plaintiffs further argue that in deleting from the Critical Edge definition any references to the Rachel Carson Wildlife Refuge or the 1988 Critical Edge Map and leaving only the reference to areas 150 feet inland from the coastal wetland, the Critical Edge Zone was established as an independent zoning district through § 3.3(M). Plaintiffs conclude therefore that any area within 150' inland from any coastal wetland is included in the "Critical Edge Zone." Plaintiffs argue that this restriction is consistent with other development restrictions in the Town. For example, the shoreland zoning map reveals that nearly all of the Atlantic coastline has been placed in Resource Protection Districts.

3. The Town's Growth Management Plan

Under the growth management provisions set forth in Maine law, the Town has adopted a growth management plan. See 30-A M.R.S.A. §§ 4321-4327. The Town's March 1996 Comprehensive Plan is the controlling growth management plan. **R. Tab 40 at pp. 251-55.** A municipality's zoning ordinance "must be pursuant to and consistent with a comprehensive plan adopted by the municipal legislative body." 30-A M.R.S.A. § 4352(2).

Defendants note that Kennebunkport's Comprehensive Plan does not include tidal areas in its definition of coastal wetlands. **R. Tab 40 at p. 252.** The Comprehensive Plan defines wetlands as follows: "A wetland is characterized by wetland vegetation, standing water most of the year, and very poor drainage." **R. Tab 40 at p. 252.** The Comprehensive Plan recognized that there are both coastal and freshwater wetlands and states that wetlands of both types are indicated on Map IV-3 as being part of coastal wetland. The Boston property is not shown on Map IV-3 as being part of a coastal wetland. See attachment to Defendant's Brief. Because of the history of the development of the Critical Edge and to avoid rendering portions of the Ordinance surplusage, Defendants conclude that this narrower definition of the term "coastal wetland" is more appropriate in the context of § 3.3(M) of the Ordinance.

The Plaintiffs argue that the Town's Growth Management Plan is irrelevant to the interpretation of §§ 2.2 and 3.3(M) when the Land Use Ordinance contains a detailed definition of "coastal wetland." The Plaintiffs also argue that Map IV-3 of

23

the Comprehensive Plan does is not a comprehensive inventory of the Town's wetlands and describes only "Wetlands Known to Date in Kennebunkport 1986."

"The meaning of terms or expressions in zoning ordinances calls for the construction of legislation and is a question of law for the court." Camplin v. Town of York, 471 A.2d 1035, 1037 (Me. 1984). In Camplin, the term "lots of record" was not defined in the zoning ordinance. The Plaintiff urged the Court to adopt the definition contained in the town's building code. The Law Court stated that:

> Under Maine law, instead of looking outside the ordinance for assistance in ascertaining the meaning of an undefined term, we are required to look to the ordinance itself for guidance. Undefined terms should be given their common and generally accepted meanings unless the context requires otherwise. . . . Absent a showing, therefore, that York's building code is in some way incorporated into its zoning ordinance, it is improper in the present case to look to the building code to provide a definition missing from the zoning ordinance. Id. at 1038.

Importing a definition of coastal wetlands from the Comprehensive Plan Inventory is problematic. However, the term coastal wetlands, as defined in the Ordinance and applied in the context of the Critical Edge Zone, must not lead to illogical and inconsistent results. See Melanson v. Belyea, 1997 ME 150, ¶ 4, 698 A.2d 492, 493 (statutory language must be construed to avoid absurd, inconsistent, unreasonable or illogical results). "The terms or expressions in an ordinance are to be construed reasonably with regard to both the objectives sought to be obtained and the general structure of the ordinance as a whole." Gerald v. Town of York, 589 A.2d 1272, 1274 (Me. 1991). See also Cumberland Farms, Inc. v. Town of Scarborough, 1997 ME 11, ¶ 6, 688 A.2d 914, 915 ("Individual provisions must be interpreted in harmony with the overall scheme of a zoning ordinance.").

The term coastal wetlands can be applied in the context of the Critical Edge zone without inconsistent, illogical results. The definition of the Critical Edge zone merely states that this overlay zone covers a strip of land 150′ in width, upland from and parallel with the edge of the coastal wetland. The Plaintiffs import the definition of coastal wetland contained in § 2.2, and therefore argue that <u>any</u> area within 150′ inland from <u>any</u> tidal or subtidal land is included in the Critical Edge zone. Defendants counter that this definition is too broad and leads to conflicts within the ordinance. They specifically point to portions of the ordinance which allow water dependent uses. Section 5.3(B) of the Ordinance, for example, permits "temporary piers, docks, wharves, bridges, breakwater, causeways and uses projecting into the water or wetlands." The allowance for such water dependent uses does not conflict with the definition of the Critical Edge Zone that merely defines the breadth of the zone.

Similarly § 5.6(I) of the Ordinance requires that all structures in the Shoreland Zone be set back at least seventy-five feet from the normal high water mark. However, this does not conflict with either the definition of the Critical Edge zone, or the restrictions on building within this zone contained in § 5.5(C). According to § 5.5(C) any vacant lot of record as of March 22, 1988, which is wholly or partially within the the Critical Edge zone may have one residential building erected on the lot. The building and any necessary improvements "must be located as far from the coastal wetland as practical, but in no case less than 75 feet." However, because the Boston property already contains a residence and falls within the Critical Edge zone, a new residence may not be built.

## D. Did the CEO correctly identify the normal high water mark of coastal waters?

The "normal high water mark of coastal waters" is defined as "[t]hat line on the shore of tidal waters which is the apparent extreme limit of the effect of the tides, i.e. the top of the bank, cliff or beach above the high tide." § 2.2, **R. Tab 63 at p. 509.** For properties located in the Shoreland overlay zone, all new structures must be set back at least 75' from the normal high water mark of the Atlantic Ocean. § 5.5(I)(1), **R. Tab 63 at p. 560.**

The CEO determined the normal high water mark on the southeasterly portion of the property to be at an elevation of 9 on the Livingston-Hughes plan.[7] **R. Tab 16.** Plaintiffs argue that the normal high water mark is at elevation 11 on the Livingston-Hughes plan, which corresponds to the top of a concrete bank running along the southeasterly side of the Boston property. The CEO testified that he took property elevations, vegetation and debris lines into account in determining the normal high water mark. **R. Tab 46 at pp. 326-27.** He maintained that their was no evidence of debris on the top of the concrete bank. **R. Tab 46 at p. 327.** The CEO testified that he tended to be very conservative in locating the normal high water mark. **R. Tab 46 at 327.** Mr. Hughes, a surveyor, agreed that the CEO was conservative in locating the high water mark. **R. Tab 46 at p. 319.** Hughes rejected Plaintiffs' contention that the normal high water mark was located at the top of the bank, at elevation 11, because in his opinion, this location would mean that the

---

7 Apparently the parties agree that the normal high water mark on the southwesterly side of the Boston property is the seawall, but disagree as to the location of the normal high water mark on the southeasterly side of the Boston property.

normal high water mark coincided with the 100-year flood plain. **R. Tab 46 at p. 321.**[8]

The Board accepted the CEO's determination regarding the location of the high water mark and argues that there is substantial evidence in the record to support the CEO's determination. **R. Tab 58 at p. 470.** The Board specifically found that the CEO's determination of the normal high water mark was consistent with past determinations and was conservative considering it was approximately five inches below the 100 year flood level at Goose Rocks Beach, just up the coast. **R. Tab 58 at p. 470.**

The Plaintiffs rely in part on  <u>Mack v. Municipal Officers of Cape Elizabeth</u>, 463 A.2d 717 (Me. 1983) in which the Law Court construed the same definition of the "normal high water mark of coastal waters" as is contained in the Kennebunkport

_____

8 Ms. Boston obtained a Letter of Map Revision from the Federal Emergency Management Agency (FEMA). **R. Tab 27 at p. 107-08.** This Letter noted that a portion of the Boston property is located within a Coastal High Hazard Area (Zone V2). <u>See</u> **R. Tab 27 at p. 113 for definitions.** The Letter stated that "we encourage you to require that the lowest adjacent grade and lowest floor (including basement/crawl space) elevation of any structure placed on the area described by metes and bounds be elevated to a level at or above the base flood elevation of 11.0 feet National Geodetic Vertical Datum of 1929." "Base flood" is defined as "the flood which has a one percent chance of being equalled or exceeded in any given year (also known as a 100-year flood). This term is used in the National Flood Insurance Program (NFIP) to indicate the minimum level of flooding to be used by a community in its floodplain management regulations." **R. Tab 27 at p. 113;** <u>see also</u> **R. Tab 27 at p. 92.**

The Plaintiffs argue that a Letter of Map Amendment does not constitute a determination that the FEMA-established Base Flood Elevation is correct. Rather, the FEMA assumes the correctness of the base flood elevation it has already calculated for the property, and only determines whether, based upon the topographical information submitted to it by the applicant, the proposed building site is above the assumed base flood elevation. <u>See</u> Application **R. Tab 19.**

The Federal Emergency Management Agency (FEMA) bases its determination on the flood hazard information at the time of the determination. **R. Tab 23 at p. 73.** The FEMA cautions that "[r]equestors should be aware that flood conditions may change or new information may be generated that would supersede FEMA's determination." **R. Tab 23 at p . 73.** The FEMA also cautions that a Letter of Map Amendment does not signify that the property is no longer threatened by flooding. **R. Tab 23 at p. 73-74.**

Land Use Ordinance. The Court noted that "the definition begins with a general definition ('that line on the shore of tidal waters which is the apparent extreme limit of the effect of the tides') and ends with what are obviously intended to be three examples ('the top of the bank, cliff or beach above high tide')." Id. at 722. The Court concluded that:

> The Board properly interpreted the definition of normal high-water mark by taking into account the effect of the tides beyond the high-tide level of the water itself. The ordinance specifically refers to the extreme limit of the *effect* of the tides. The definition of "normal high water mark" also includes the top of the bank, cliff or beach *above* high tide. Thus, the ordinance contemplates some terrain above the high-tide level that is still within the effect of the tides. Id.

Plaintiffs focus on the three examples of the normal high water mark - i.e. the top of the bank, cliff, or beach above high tide, while the Defendants contend that these landmarks serve only as illustrations of the general definitional language (the line on the shore of tidal waters which is the apparent extreme limit of the effect of the tides), which controls the determination of the location of the high water mark.

The Plaintiffs argue that land subject to regular tidal action will suffer the complete erosion of whatever organic topsoil and terrestrial plants might originally have been present, leaving only sandy rocky soil and marine, salt-tolerant vegetation - the landward limit of that erosion will naturally appear as the top of a bank, cliff or beach. Plaintiffs therefore argue that the top of the bank on the property, shown as elevation 11 on the Livingston-Hughes plan, is the normal high tide mark. **R. Tab 16**. To further support their argument, the Plaintiffs have submitted tide charts demonstrating that an 11-foot tide is not a rare event in the vicinity of the Boston property. These tide charts show that tides of at least 11 feet

28

were reported or predicted for three days in December 1999; two days in January, 2000; and three days in June, 2000.[9] **R. Tab 54.**

The Plaintiffs have also offered a videotape purporting to show actual footage of a high tide, not augmented by winds or wave action, reaching the top of the bank, approximately ten feet further inland than the line chosen by the CEO.[10] Plaintiffs conclude that, measured from the top of the bank, the proposed O'Neill residence is located less than seventy-five feet from the normal high water mark.

Neither parties' position is particularly persuasive. The second video begins approximately one hour before high tide and shows the tide approximately eight to ten feet from the base of the concrete bank. There is very little wave action. Approximately twenty minutes before high tide, the tide appears to be five to ten feet from the base of the bank. Near the end of the tape, Steve Walker, the commentator for the video, remarks that if there was wave action, the waves would come up almost to the foot of the cement bank. This assertion is supported by the

---

[9] An abutter also testified that the Boston property was subject to twelve foot tides without tides. **R. Tab 46 at p. 330-31.**

[10] The first videotape, showing low tide at the Boston property, was introduced at the December 6, 1999 Board meeting by the Plaintiffs' expert, Steve Walker. **R. Tab 46 at p. 298.** The parties dispute whether or not the Court should consider the Plaintiffs' second videotape. Through their motion for a trial of the facts, Plaintiffs asked this Court to consider their second video tape, 21 minutes in duration, also prepared by Walker. The Defendants argue that the second videotape should be disregarded because Plaintiffs chose not to play this videotape at the January 3, 2000 meeting (**R. Tab 57 at p. 468**) and because the second tape does not constitute rebuttal evidence. However, after the Plaintiffs submitted the first videotape at the hearing, the Defendants countered with their own evidence regarding the high water mark. **R. Tab 46 at pp. 318-21; 326-27.** Therefore, Plaintiffs second video, which pertains to the high water mark, can be properly considered as rebuttal evidence, which constitutes "evidence which contravenes, antagonizes, confutes, or controls 'the inference sought to be drawn by new facts introduced by the adverse party at the next previous stage.'" Payson v. Bombardier, 435 A.2d 411, 413 (Me. 1981)(citing Emery v. Fisher, 128 Me. 124, 125, 145 A. 747 (1929)).

29

type of debris deposited up to and at the base of the bank. Neither the CEO nor Walker identified debris left by the tide at the top of the bank. Plaintiffs' position that the normal high water mark is at the top of the bank is therefore not supported by the record.

Plaintiffs' rely on <u>Mack</u> for the proposition that the normal high water mark is naturally and obviously the "top of a bank, cliff or beach." This reliance however, seems to be misplaced. The Court in <u>Mack</u> was clear that "the top of the bank, cliff or beach above high tide" are "obviously intended to be three examples" and therefore do not control the general definitional language - "that line on the shore of tidal waters which is the apparent extreme limit of the effect of the tides."

The Defendants' position is equally unsatisfactory. Unfortunately, the high water mark designated by the CEO (elevation of 9 on the Livingston-Hughes plan) is not identified in the video. As noted above, however, the video shows the Atlantic Ocean with very little wave or wind action, and the high tide appears to come within 5 to 10 feet of the base of the concrete bank. It is entirely possible therefore, that the "extreme limit of the effect of the tides" is much closer to the bank. This proposition is supported by the video footage showing tidal debris at the base of the bank. The Board must take into account the effect of the tides beyond the high-tide level of the water itself. <u>See</u> <u>Mack v. Municipal Officers of the Town of Cape Elizabeth</u>, 463 A.2d at 722. As well, Defendants do not account for tide charts showing tides of at least eleven feet, reported or predicted for eight days since December 1999 for Cape Porpoise. Given the ambiguity in the evidence, the findings of the Board with respect to the high water mark must be sustained.

Thus, the entry will be as follows:

Plaintiffs' Rule 80B appeal is granted; case remanded to Board with instructions to declare the building permits void.

The clerk may incorporate this order in the docket by reference.

Dated: February 12, 2001

G. Arthur Brennan
Justice, Superior Court

PLAINTIFF:
JOHN BANNON, ESQ
MURRAY PLUMB AND MURRAY
PO Box 9785
Portland Me 04104-5085


DEFENDANT CONSTANCE BOSTON:
MICHAEL MACLEOD-BALL, ESQ
BERGEN & PARKINSON
62 Portland Rd
Kennebunk  Me 04043


DEFENDANT KENNEBUNKPORT:
William Dale, Esq.
JENSEN BAIRD GARDNER AND HENRY
PO Box 4510
Portland Me 04112

DEFENDANTS    TIMOTHY & LINDA O'NEILL:
SALLY DAGGETT ESQ
JENSEN BAIRD GARDNER AND HENRY
PO Box 4510
Portland Me 04112-4510